Filed 11/4/20  P. v. Gomez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ELIAS RICHARD GOMEZ,<br><br>Defendant and Appellant. | F075252<br><br>(Kern Super. Ct. No. BF1590808)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Meredith Fahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Daniel B. Bernstein, and Cavan M. Cox II, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Elias Richard Gomez was charged with felony assault and battery, and his brother, codefendant Efren Gomez, was charged with misdemeanor battery, arising from an incident in a brewery's parking lot where defendant punched a man who was walking to his car. Both defendants were represented by the same attorney.

During jury selection, the prosecution made a motion pursuant to *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and asserted defense counsel was purposefully discriminating against prospective jurors who were Caucasian by using 11 of his 14 peremptory challenges to remove them from the jury. The court found the prosecutor made a prima facie case of purposeful discrimination and asked defense counsel to give reasons for the joint peremptory challenges. Counsel was able to give reasons for some of the challenges, said he did not have notes on others, and ultimately stated he was seeking a jury that was representative of the demographics of the county between Hispanics and Caucasians. The court granted the prosecutor's *Batson/Wheeler* motion. Both the prosecutor and defense counsel requested dismissal of the panel and calling a new venire. Instead, the court denied defendant's last peremptory challenge, reseated that person in the jury, and the parties continued with voir dire.

Defendant was convicted of felony assault with force likely to cause great bodily injury after attacking someone in a parking lot, and he was placed on probation. Codefendant Efren was found not guilty of misdemeanor battery.

On appeal, defendant contends the trial court improperly addressed the prosecutor's *Batson/Wheeler* motion, which resulted in structural error requiring automatic reversal of his conviction. Defendant asserts the prosecutor's motion was meritless because Caucasians are not a cognizable group within the meaning of *Batson/Wheeler*. Defendant further argues the court failed to make the prosecutor meet

2.

her burden of showing a prima facie case, and improperly shifted the burden to defense counsel to state reasons for his challenges. Finally, defendant argues defense counsel gave racially neutral reasons for his peremptory challenges, and counsel did not act improperly when he said that he was trying to obtain an equal distribution of Hispanics and Caucasians on the jury. We affirm.

## PART I

## FACTS OF CHARGED OFFENSES

On the evening of October 18, 2014, husband and wife, Michael (Michael) and Kelly (Kelly) McGraw, were at Lengthwise Brewery with some friends. Around 11:00 p.m., the McGraws and their friends left the brewery and headed for their car. As they walked through the parking lot, they encountered two men later identified as defendant Elias Richard Gomez and his brother, codefendant Efren Gomez (Efren).[1]

Defendant was not wearing a shirt; he was running and jumping around and waving his arms. Michael testified defendant was "running back and forth across the parking lot swinging his arms kind of windmill style. He would stop, then run a few feet and stop again. A couple of times he stood in place and was just jumping up and down." Efren was talking on a cell phone. Defendant and Efren were standing between the McGraws and their car, and Efren was closer to them.

Michael asked Efren whether defendant was his friend. Efren said yes. Michael suggested Efren should check on defendant because he was "acting pretty crazy" and looked like he might "hurt himself or maybe go to jail." Efren asked why he would care. Michael said he was just trying to help. Michael testified his voice was not aggressive, and he was genuinely concerned and would have called a cab if they needed it. Michael further testified that he never spoke to defendant or touched him in any way.

---

[1] Given that several parties have the same last names, we will refer to the witnesses by their first names for ease of reference; no disrespect is intended.

3.

As Michael spoke with Efren, defendant was standing to his side, and Michael lost sight of him. Kelly testified defendant ran behind Michael, drew his arm back, and punched Michael on the left side of his face. Michael was knocked unconscious and fell to the ground.

Kelly testified she yelled at defendant, and he swung at her and missed. Kelly threw her soda at him. Kelly testified Efren pushed her down to her knee. She tried to get up, and Efren again pushed her down. Defendant and Efren ran away. Michael was unconscious for about one minute.

The McGraws' friends had witnessed the assault on Michael and called 911. The police responded to the parking lot and contacted the McGraws while other officers looked for the two suspects.

The officers found defendant and his brother about one block away, hiding behind bushes. The McGraws were taken to their location and identified them as the two suspects.

When defendant was taken into custody, the officers did not observe any visible physical injuries, he did not act like he had been injured, and he was not flailing or waving his arms. Both defendant and Efren had red, watery eyes and slurred speech, and appeared to be under the influence of alcohol.

The officers testified Michael was dazed from being punched in the face, and he did not appear to be under the influence. He had a bruise on the back of his head. Michael declined an ambulance. After they gave their statements to the police, Kelly drove Michael to the emergency room. He was diagnosed and treated for a fracture to his left cheekbone.

Michael testified he had four or five beers with dinner that night, but he was alert. On cross-examination, Michael conceded his blood-alcohol level was 0.165 percent when he was tested at the hospital several hours after the assault.

4.

**Defense Case**

Defendant did not testify.

Codefendant Efren testified that earlier that night, defendant and Efren joined a large group of their friends at the Whiskey Barrel bar, which was near Lengthwise Brewery. Defendant had a couple of drinks. Efren testified he never drank anything that night. As they left the bar, some unknown men jumped defendant and beat him up. Efren and some of his friends pulled defendant away, and the unknown assailants ran away. As a result of the beating, defendant was confused, bleeding, stumbling around, and had injuries on his face. Efren helped defendant walk to their car that was in Lengthwise Brewery's adjacent parking lot and called his other friends who were still in the bar.

Efren testified he was still on the phone and walking in the parking lot with defendant when a man, later identified as Michael, yelled in an aggressive manner that he better "check" his friend, referring to defendant. Efren thought Michael was drunk. Efren testified Michael walked up to defendant at a rapid pace and pushed him. Michael had an aggressive look on his face and took a "stance" like he was going to fight with defendant. Defendant immediately reacted and punched Michael one time. Michael lost his balance and fell.

Efren testified defendant never tried to punch Kelly, and she did not throw anything at him. Efren further testified that he did not push her down. Kelly yelled at them to get out of there. Efren grabbed defendant and pulled him from the McGraws, and they left the area.

**Charges and convictions**

Defendant was charged with count 1, assault by means of force likely to produce great bodily injury on Michael (Pen. Code, § 245, subd. (a)(4)),[2] with a great bodily

---

[2] All further statutory references are to the Penal Code unless otherwise stated.

injury enhancement (§ 12022.7, subd. (a)); and count 2, felony battery resulting in the infliction of serious bodily injury on Michael (§ 243, subd. (d)).

Codefendant Efren was separately charged with count 3, misdemeanor battery on Kelly (§ 242).

Defendant and Efren were represented by the same defense attorney. The court advised both defendants of their rights to conflict-free counsel, and they waived all conflicts both orally and in writing.

On November 18, 2016, after a joint jury trial, defendant was convicted of count 1, felony assault with force likely to produce great bodily injury, but the jury found the great bodily injury allegation was not true.

Defendant was found not guilty of count 2, felony battery, and guilty of the lesser included offense of misdemeanor simple battery (§ 242).

The jury found Efren not guilty of misdemeanor battery (§ 242).[3]

On January 5, 2017, the court suspended sentence for count 1 and placed defendant on felony probation for three years subject to specific terms and conditions, including serving the first year in county jail; and a concurrent term of 180 days for count 2, that was stayed pursuant to section 654.

On March 3, 2017, defendant filed a timely notice of appeal.

## PART II

## JURY SELECTION

Defendant raises one issue on appeal. He contends the court improperly granted the People's *Batson/Wheeler* motion during voir dire based on the claim that the defense

---

[3] As to Efren, the jury was instructed on the elements of misdemeanor simple battery in violation of section 242 as the charged offense. The jury was further instructed on the lesser included offense of simple assault in violation of section 243. The verdict form, where the jury found Efren not guilty, correctly identified the charged offense as a violation of section 242, but erroneously identified it as "simple assault."

used peremptory challenges to purposefully discriminate and remove prospective jurors who were Caucasian.

In order to address this issue, we will review jury selection, the defense's peremptory challenges, the People's *Batson/Wheeler* motion, defense counsel's reasons for the challenges and whether they are supported by the record, and the court's ruling and remedy.

We first begin with a brief review of *Batson/Wheeler* motions. "Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity. [Citations.] When the defense raises such a challenge, these procedures apply: 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' [Citations.]" (*People v. Davis* (2009) 46 Cal.4th 539, 582; *People v. Rhoades* (2019) 8 Cal.5th 393, 423 (*Rhoades*).)

A *Batson/Wheeler* motion is most often made by the defense against the prosecution's use of peremptory challenges based on the claim of purposeful discrimination of a cognizable group in violation of due process and equal protection. (*Batson*, *supra*, 476 U.S. at p. 85.) The United States Supreme Court has applied this principle equally to prosecutors and criminal defendants because "[t]he Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges. Accordingly, if the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges." (*Georgia v. McCollum* (1992)

7.

505 U.S. 42, 59 (*McCollum*); see, e.g., *People v. Willis* (2002) 27 Cal.4th 811, 813 (*Willis*).) *Batson* applies to defense challenges to members of a cognizable group because "[i]n exercising a peremptory challenge, a criminal defendant is wielding the power to choose a quintessential governmental body" and is, therefore, "bound by the constitutional mandate of race neutrality. [Citation.]" (*McCollum*, *supra*, 505 U.S. at p. 54.)

A prosecutor's objection to the defense's use of peremptory challenges, based on the claim of purposeful discrimination of a cognizable group, has been described as a "reverse-*Batson*" challenge, and is based on the same three steps applied when the objection is raised by the defense. As a result, the prosecution has the initial burden to establish a prima facie case of discriminatory purpose before the burden shifts to the defense to adequately explain the challenges by offering race-neutral explanations. The court must then decide if the prosecution has proved purposeful racial discrimination in the defense's use of peremptory challenges. As with objections raised by the defense, the ultimate burden of persuasion regarding discriminatory motivation in a reverse-*Batson* motion rests with, and never shifts from, the prosecution as the moving party and opponent of the peremptory challenge. (See, e.g., *United States v. Thompson* (2d Cir. 2008) 528 F.3d 110, 115–118; *United States v. Thomas* (5th Cir. 2017) 847 F.3d 193, 208; *United States v. Cruse* (7th Cir. 2015) 805 F.3d 795, 806807 & fn. 4; *Parnell v. Lape* (E.D.N.Y. 2011) 791 F.Supp.2d 319, 326–327; *Alston v. Phillips* (E.D.N.Y. 2010) 703 F.Supp.2d 150, 173.)

**The first set of 24 prospective jurors**

We now turn to jury selection in this case, which was held on October 26, 27, and 28, 2016.

On October 26, 2016, the court called 48 prospective jurors into the courtroom, made preliminary remarks, and addressed hardship requests and potential conflicts for the

entire venire. As the court spoke with each person, the reporter's transcript identified the prospective juror with a seven-digit identification number.

On October 27, 2016, the court seated the first set of 24 prospective jurors in the box for voir dire. Each prospective juror was identified by seat number the court placed the person in at that time (ex. juror Nos. 1–24), and not by the person's seven-digit identification number.

The court began by conducting voir dire and asked the 24 prospective jurors to respond to specific questions. Each person was identified by his/her seat number while answering questions.

Defense counsel then questioned the prospective jurors followed by the prosecutor. In doing so, they also addressed the prospective jurors by the seat number they had just been placed in, and not their seven-digit identification number.

**The first round of peremptory challenges to the first set**

On the afternoon of October 27, 2016, the court directed the parties to exercise their peremptory challenges on the first set of prospective jurors sitting in seat Nos. 1 through 12. The prosecutor and defense counsel alternatively used their peremptory challenges.[4]

---

[4] As noted above, defense counsel represented both defendant, who was charged with two felonies that carried potential prison terms; and his brother, Efren, who was charged with misdemeanor simple battery punishable by a fine or a maximum of six months in custody (§ 243, subd. (a)).

During voir dire, both the court and defense counsel said that counsel was exercising joint defense challenges.

At the time of the trial, in a criminal case where the maximum punishment for the charged offense is not life imprisonment or death, "the defendant is entitled to 10 and the state to 10 peremptory challenges. When two or more defendants are jointly tried, their challenges shall be exercised jointly, but each defendant shall also be entitled to five additional challenges which may be exercised separately, and the people shall also be entitled to additional challenges equal to the number of all the additional separate challenges allowed the defendants." (Code Civ. Proc., § 231, subd. (a).) Since defendant

The prosecutor challenged seven people. Defense counsel challenged six people. As each person in seat Nos. 1 through 12 was challenged and excused, the court directed the next person sequentially sitting in seat Nos. 13 through 24, and who had already been questioned, to take the excused person's place. In doing so, the court identified the replacement juror based on that person's seat number during the first round of voir dire, and not their seven-digit identification number.

**The second set of 23 prospective jurors**

After the parties completed their first round of challenges, the court stated that from the first set of 24 prospective jurors, 11 people remained in seat Nos. 1 through 12. There were also nine other individuals who had been in seat Nos. 13 through 24 and had not been challenged.

Later, on October 27, 2016, the court asked the 20 people from the first set of prospective jurors to return to the audience.

The court called in the second set of 24 prospective jurors and seated them in the box. The court again identified and addressed each person by the seat number they had

was charged with felonies that carried prison terms, defense counsel was entitled to 10 peremptory challenges on his behalf.

However, Efren was charged with a misdemeanor punishable by either a fine or a custodial term not exceeding six months. "If the offense charged is punishable with a maximum term of imprisonment of one year or less, the defendant is entitled to six and the state to six peremptory challenges. When two or more defendants are jointly tried, their challenges shall be exercised jointly, but each defendant shall also be entitled to two additional challenges which may be exercised separately, and the state shall also be entitled to additional challenges equal to the number of all the additional separate challenges allowed the defendants." (Code Civ. Proc., § 231, subd. (b).)

On appeal, the People assert that defense counsel had 20 joint peremptory challenges pursuant to Code of Civil Procedure section 231, subdivision (a), since counsel represented both defendants, and they were tried together. While defendant and Efren were tried together, they were charged with different offenses as defined by section 231. Based on those statutory definitions, it appears that defense counsel had 10 challenges for defendant pursuant to section 231, subdivision (a) and six challenges for Efren under section 231, subdivision (b).

just been directed to sit in (Juror Nos. 1–24), and not the seven-digit juror identification number. The court noted that one person had failed to appear, and there were only 23 people in this group. The court began voir dire and then adjourned for the day.

On October 28, 2016, the court resumed voir dire with the second set of 23 prospective jurors. Defense counsel and the prosecutor asked questions of each prospective juror in the second set, again referring to them by their seat numbers.

**The second round of peremptory challenges**

After the parties finished their questions, the court asked the second set of 23 prospective jurors to return to the audience. It directed the 11 people from the first set of prospective jurors to return to their original seat numbers in the box.

There was no one in seat No. 4 from the first group of 11 prospective jurors who had cleared the first round of peremptory challenges. The court selected a person from the second set of prospective jurors to sit in seat No. 4 so there was a full group of 12 prospective jurors in the box. The court then asked people from the second set of prospective jurors to take seat Nos. 13 through 18 and explained they would be used to replace anyone challenged from seat Nos. 1 through 12 in the box.

The record indicates the court read aloud the names of the prospective jurors from the second set who were placed in seat Nos. 4 and 13 through 18. Their names have been redacted from the reporter's transcript. Unfortunately, there is no way to identify these individuals, either by what seat they were in during voir dire of the second set or their seven-digit identification numbers.

The court directed the parties to exercise their peremptory challenges on this group of prospective jurors. The prosecutor used seven challenges and defense counsel used eight challenges.

### THE PROSECUTION'S *BATSON/WHEELER* MOTION

Immediately after defense counsel used a peremptory challenge for Juror No. 2, the prosecutor approached the bench and advised the court that she was making a

11.

*Batson/Wheeler* motion, asserting that defense counsel was using peremptory challenges to purposefully discriminate and remove Caucasians from the jury. The court excused the prospective jurors and conducted a hearing.

**The court's prima facie finding**

The prosecutor argued there was a prima facie case for purposeful discrimination in violation of *Batson/Wheeler* because defense counsel used 11 of his 13 or 14 peremptory challenges to remove Caucasians from the jury.[5]

Defense counsel replied that the prosecutor had to identify which 11 Caucasians had been challenged to make a prima facie case of purposeful discrimination. Counsel further stated it appeared there were six people who were Caucasian out of the 12 people who remained in the box after the second round of peremptory challenges. Counsel said if he had been exercising peremptory challenges to purposefully discriminate, there would not be six Caucasians in the box.

The court acknowledged defense counsel's remarks about the current composition of the prospective jurors. However, the court found, "[b]ased on the numbers and what's been observed by the court," there was "a reasonable inference at this time" of a prima facie case of systematic exclusion of prospective jurors who were Caucasians, and asked defense counsel for an explanation for his use of the peremptory challenges.

**Defense counsel's initial reasons for the peremptory challenges**

Defense counsel said he could not explain his challenges without knowing which 11 people were the basis for the prosecution's *Batson/Wheeler* motion.

The prosecutor said she had a list with 11 names of challenged prospective jurors. The court directed the prosecutor to give her list of suspect peremptory challenges to defense counsel, and asked counsel to address each person on the list.

---

[5] The record shows defense counsel had used a total of 14 peremptory challenges in the two rounds.

The appellate record does not contain a copy of the prosecutor's list of suspect challenges. The reporter's transcript does not identity these 11 prospective jurors by their names, their seven-digit identification numbers, what day they were challenged, or even by the seat numbers they were excused from, except for the following statements by the court and the parties as defense counsel addressed 10 names on the list.

The hearing continued as follows, with the court reading the names from the prosecutor's list of the prospective jurors who defense counsel allegedly challenged because they were Caucasians.

### *The prosecutor's first name*

The court read aloud the first name on the prosecutor's list, which has been redacted from the reporter's transcript. Based on the court's subsequent comments, it appears the first person had the identification No. 4185308.

The court asked defense counsel to explain his challenge for that person. Counsel said: "I don't like him. I'm searching for my notes with regards to that which I took yesterday." Defense counsel found his notes and continued: "He had [a] D.U.I. in 2009, thought that he was guilty and deserved it, and thought law enforcement was just handy dandy in their treatment. [¶] For that purpose, I had decided to challenge him."

The record confirms that during the court's initial voir dire, Juror No. 4185308 said he had a prior conviction for driving under the influence and was satisfied with how it was resolved by the district attorney's office.[6]

---

[6] On appeal, defendant has tried to reconstruct voir dire and cited to the record for defense counsel's reasons for the peremptory challenges, since counsel was unable to recreate his notes given the court's confusing identification system. The People dispute the accuracy of defendant's tracking, and further argue this court may only rely on the reasons defense counsel gave in response to the court's questions at the *Batson/Wheeler* hearing. However, this court will review the record to the extent possible to determine whether defense counsel's reasons were supported by the record of voir dire.

The court accepted the validity of defense counsel's reason for this first challenge. On appeal, the People concede defense counsel gave a race-neutral reason for this challenge.

### *The prosecutor's second name*

The court read the next name on the prosecutor's list (again redacted). Defense counsel said he needed a juror number for this person and asked if he was "the gentleman that was excused this morning." The court said yes. Defense counsel said, "His answers with regards to questions involving his position with regards to what a person should do when threatened with violence. If I recall correctly, he was one of the many individuals who indicated that he thought that a person should flee rather than defense himself. [¶] I don't want that kind of juror."

The record shows that the primary focus of defense counsel's questions to the second set of prospective jurors was about whether someone was entitled to stand his ground and defend himself against a person using violence, anticipating defendants' trial claim that the victim attacked them first. The prospective jurors gave different responses to his questions.

While this particular prospective juror's responses during voir dire cannot be tracked, the People concede on appeal that defense counsel's reason for challenging this juror was race-neutral.

### *The prosecutor's third name*

The court read the next name (redacted) and defense counsel said he could not remember whether "she" responded to his questions earlier that day about a defendant's duty to retreat. Defense counsel then referred to this person as "Ms. [F]" and believed she was one of the people "who also indicated she believed that there should be a duty to retreat rather than defend ones [*sic*] self."

The prosecutor replied that Ms. F. was not one of the people who defense counsel questioned about a duty to retreat, that defense counsel "stopped at Juror Number Three,

14.

and [Ms. F.] was seated in Seat Number Four. If I recall correctly, there was no contest with Ms. [F]."

The court concurred that its "own notes showed the same" as the prosecutor's notes about this person.

### *The prosecutor's fourth name*

The court read the next person's name (redacted). Defense counsel asked which day that person had been challenged. The court said, "[S]he was number two, yesterday, if that helps." Counsel said that did not help, and he did not make notes on the prospective jurors' reactions. "I think I'm reduced to the situation where we would have to read back the voir dire of that individual, because I have no independent recollection."

On appeal, defendant asserts that Juror No. 2 from the first set answered questions from the court, which gave defense counsel the opportunity to observe her demeanor.

### *The prosecutor's fifth name*

The court read the next name (redacted) but said they could move past that person because he was the father of a district attorney.[7]

The record shows that Juror No. 11 from the first set said his/her son was a deputy district attorney. Defense counsel used his first peremptory challenge on this person. On appeal, the People concede defense counsel's reason for this challenge was race-neutral.

### *The prosecutor's sixth name*

The court read the next name (redacted), and counsel again asked what day that person had been questioned and challenged. The prosecutor said it was on both days. The court said "she" became part of the jury "this morning," and she had been in seat No. 13, she was moved into seat No. 6, and counsel questioned her that day.

---

[7] In his analysis of the peremptory challenges in his appellate brief, defendant skips over the fifth person, who was the parent of a district attorney.

Defense counsel said he felt "she was not responding to me in a positive manner. I felt that she exhibited antipathy towards me."

The prosecutor replied that defense counsel "never tried to engage her. She appeared engaging the entire time, nodding along. She was never singled out for any conversation." The court again agreed with the prosecutor based on its own notes.

On appeal, the People assert that the reason given by defense counsel at the hearing, "if believed," is race-neutral.

### *The prosecutor's seventh name*

The court read the next name (redacted), and defense counsel again asked which day this person was questioned and excused. The court said this person was in seat No. 12 the previous day in the first set of prospective jurors. Defense counsel said he did not have his notes from the prior day, and he would get them at the next break.

The record shows the person sitting in seat No. 12 from the first set of prospective jurors said her husband attended the CHP academy. Defense counsel used his second peremptory challenge to the first set to excuse this person.

### *The prosecutor's eighth name*

The court read the next name (redacted), and that "she" had been in seat No. 18 in the first set the prior day. Defense counsel could not give a reason and again said he had to check his notes during the break.

Based on our review of the record, the person from the first set who was originally in seat No. 18, was moved to No. 12 as the peremptory challenges were made in the first round.

While defense counsel could not remember his reasons, the record shows this person said a nephew was in the Bakersfield Police Department, and two sons-in-law were officers with the Department of Corrections. Defense counsel used his fourth peremptory challenge to remove this person during the first round.

16.

### *The prosecutor's ninth name*

The court read the next name (redacted). Defense counsel said "she" was in seat No. 20 and asked where she was sitting that morning. The court said she was still in seat No. 20 that morning. Counsel agreed but did not comment further.

We cannot determine this person's responses to voir dire.

### *The prosecutor's tenth name*

The court read another name (redacted). Defense counsel and the court discussed what seat "she" had been in. The court said "she" had been in seat No. 21 the previous day, she was moved to seat No. 13, and then she was moved into seat No. 12 in the box after the prosecutor challenged someone. Defense counsel agreed she started in seat No. 21.

Defense counsel said he had no independent recollection about this person and had to rely on the transcripts. However, he added that he did not "feel that she was someone that appeared to be comfortable with my voir dire."

On appeal, the People state that defense counsel's reason for this challenge, if believed, would be race-neutral.

On appeal, defendant states this person was originally No. 21 from the first set, moved to No. 13 in the first set, and then moved to No. 12 during the final set of challenges. The record shows that the person who was in seat No. 21 in the first set said she was an assault victim and did not approve of someone using force. She also said her nephew was in the Bakersfield Police Department, and her brother-in-law had been a deputy sheriff and currently worked as an investigator with the district attorney's office.

However, the tracking of this person by the trial court and defendant is not supported by the record. During the first round, the person in seat No. 21 from the first set was moved to seat No. 10 during the challenges and was not removed during the first round, so presumably returned to the box in that seat number during the second round of challenges. Defense counsel did not challenge this person during the second round.

17.

Again, however, the court's confusing use of seat numbers, and refilling each seat without clarifying the new person's original number in the second round, makes it almost impossible to track voir dire once the court started seating people from the second set.

**The court's further findings about a prima facie case**

Defense counsel had used an eleventh and final peremptory challenge to remove Juror No. 2. While the prosecutor's motion was based on 11 allegedly improper challenges, the court apparently did not ask defense counsel for a reason for challenging Juror No. 2, the final challenge made before the prosecutor made the *Batson/Wheeler* motion.

After going through the prosecutor's list of people who had allegedly been improperly challenged, the court called a recess for the parties to review their notes.

After the recess, the court stated that based on its own notes, the first set of 24 prospective jurors consisted of two African-Americans, four Asian-Americans, eight Hispanics, and 10 Caucasians.

The court again noted the second set of prospective jurors consisted of 23 people because the court excused someone that morning, and there were six Hispanics and 17 Caucasians; there were no African-Americans or Asian-Americans.

The court made additional findings as to why the prosecutor made a prima facie case of systematic exclusion:

> "The first step where there is an inference of discriminate purposes, the court checked its own notes on it at the time, found, basically, everything neutral in terms of the jurors who were excluded, so, *that's why based on the number, based on the court's own notes, the totality presented to the court, that's why it did the first step, turned to the defense at that time*." (Italics added.)

**Defense counsel's additional reasons**

The court asked defense counsel if he had located his notes about the people on the prosecutor's list and could explain the rest of his challenges.

Defense counsel stated that when the prosecutor raised her objections after the second round of peremptory challenges, he was not familiar with a *Batson/Wheeler* motion at that time. During the break, however, counsel researched the matter and argued the prosecutor failed to present sufficient evidence to raise a prima facie case of systematic exclusion.

Defense counsel asked the court to summarize how many Hispanics and Caucasians were on the original venire. The court said there had been 14 Hispanics and 27 Caucasians in the entire venire.

Defense counsel argued there was already a "disproportionate" discrepancy between the number of Hispanics and Caucasians on the venire before voir dire began, and counsel had only challenged 12 Caucasians. The court and the prosecutor clarified defense counsel had removed 11 Caucasians out of counsel's 14 peremptory challenges.

> "[DEFENSE COUNSEL]: Would I be fair in concluding from that I exercised three challenges with regards to Hispanics?
>
> "THE COURT: … The issue before the court and the request was at this point was the fact that *the court did find that disproportionate number strikes against a certain group*. That's why we're here.
>
> "[DEFENSE COUNSEL]: No, no. I appreciate that, Your Honor. But I guess what I'm saying here is this. [W]e have 27 Anglos or Caucasians. We have 14 Hispanics. If in fact I exercised three challenges against Hispanics, I would suggest circumstantial evidence should be considered on the question as to whether I am using my peremptory challenges in an unfair manner. [¶] So, I would ask that … we try and establish a record with regards to whether the three that I excused were in fact Hispanic. I believe that to be so.
>
> "THE COURT: Just for the record, the totality of the circumstances presented to the court made that determination based upon its own notes. I'll leave your notes to yourself with that. So, with that, that's the record. Let's move on. We're not revisiting it. I'm asking [defense counsel] to give me the reasons you excused the jurors. That's it." (Italics added.)

Defense counsel continued to object to the court's initial prima facie finding, and argued that given the limited nature of voir dire, he did not have time to question every prospective juror and had to rely on his prior experience to decide which individuals to challenge, and whether "I don't like the way that [person] looks at me, I don't like the body language … things like that are things that I take into consideration. So, I think that should be a factor that should be considered with regard" to whether there was a prima facie case based on circumstantial evidence.

Defense counsel said he did not have adequate notes about the people he challenged during the first round the previous day, because he spent most of his time "trying to keep track of numbers rather than writing down particular information" given by the prospective jurors."

Defense counsel then stated his reasons for some of his peremptory challenges:

"… I think we're going to find out aside from me saying that I was looking for a jury that was – *because I had Hispanic defendants, I was looking for a jury that represented all aspects of the community, both Caucasians and Hispanics, that some of my challenges were exercised as I say based simply on my years of experience in looking at jurors and seeing whether I thought those jurors would be sympathetic or not sympathetic to my case*." (Italics added.)

The court asked defense counsel if he had any more notes about the prosecutor's list of suspect challenges. Defense counsel said there had been a woman in a blue sweatshirt who was "shooting me some hostile looks." Counsel said he also intended to challenge a Hispanic person in seat No. 8 based on her attitude and answers. The court said it was not relevant to discuss someone who had not been challenged.

Defense counsel continued with his reasons for the challenges:

"[M]y philosophy is this. Given the limited period of time that I have with voir dire, if I have someone who I believe based upon the body language, based upon their facial expressions is somebody that I don't think is sympathetic to the defense, I don't ask them any questions. And I think that I exercised a number of challenges based upon that just based upon

20.

years of experience looking at people and trying to determine whether based on the way they conducted themselves in court whether I felt that they would not be sympathetic to the defense. [¶]

"[*B*]*ecause my clients are Hispanic, I'm looking for a picture of this community. This community, as the court probably knows this much better than I do with regards to the demographics, if you take Kern County as a whole, were probably 50/50.*

"*That's what we have right now we have a jury that is about 50/50. I'm willing to settle for that I'm not trying to get [rid] of people just because they are white but I'm trying to get a jury that is representative of the demographics of this county*." (Italics added.)

Defense counsel said the only other way to give specific reasons would be if he obtained a transcript of voir dire and reviewed it to determine which people he had used peremptory challenges on. However, counsel did not ask for production of the transcript and instead submitted the matter.[8]

**The prosecutor's argument**

The prosecutor argued defense counsel's stated reasons showed that "he was kicking people on a race basis level. *You don't get to excuse people because they don't make the right number of Hispanics, Caucasians and African Americans*. That is what *Batson Wheeler* is designed to protect against. [¶] [Defense counsel] said numerous times, because his clients are Hispanics, he was trying to get a more mixed bunch, I guess you would say, out of the jurors that's not a non race neutral reason for exercising individuals."

The prosecutor added:

"And in response to the fact that [defense counsel] indicated that only 11 were kicked out of 27, that's doesn't matter, one is enough if it's not for a race neutral reason, if it's race based. *And I think [defense counsel's] comments on their own establish that he was excusing*

---

[8] Defense counsel said he also used some peremptory challenges to excuse some people who were teachers because the victim was a teacher. The prosecutor replied there were three teachers on the panel, and none had been excused yet.

*individuals based upon their race maybe not because their race was white, but because their race was not Hispanic.*

"Based upon his own comments and his inability to provide race neutral reasons as to why he excused the individuals he excused and the fact that a number of the explanations are absolutely inaccurate and will be supported by the transcript in this case, I would request the motion be granted." (Italics added.)

## The court grants the motion

The court granted the prosecutor's *Batson/Wheeler* motion and found defense counsel used peremptory challenges with "purposeful discrimination" to remove prospective jurors who were Caucasian.

However, the court decided not to dismiss the entire panel, declare a mistrial, and start over with a new venire of prospective jurors. Instead, the court decided to deny defense counsel's last peremptory challenge on the person identified as Juror No. 2, reseat that individual in seat No. 13, give that peremptory challenge "back" to the defense, and continue with voir dire. Defense counsel asked whether he was barred from using another peremptory challenge on that same person. The court said yes, unless some new information was revealed.

The prosecutor objected and said she was entitled to discharge of the panel and a new venire. Defense counsel agreed and said he had no objection to a new venire.

The court denied the motion to discharge the venire, and said it had the discretion to provide a different remedy instead of starting over. The court further noted the parties had already passed the jury for cause. The court said it would discuss all further challenges with the parties as they made them.

The prosecutor asked the court to make a finding as to "how many jurors you are finding the *Batson Wheeler* on, that it's not just the one juror we're calling back." The court replied, "I'm unclear on that" and said it would check its notes.

22.

Thereafter, the court resumed jury selection. Defense counsel challenged two more people and the court accepted the challenges. The parties accepted the jury and alternates as constituted.

At the end of the trial, while the jury was deliberating, the court returned to the *Batson/Wheeler* motion and addressed the prosecutor's pending question about which jurors it found had been subject to purposeful discrimination. The court stated that its ruling applied to nine juror identification numbers and listed the numbers.

Aside from the first number, however, it is impossible to match the identification numbers to the people who were later identified by their seat numbers, unless the superior court produces a jury ladder that does so.

## DISCUSSION

### I.     *Batson/Wheeler* Motions

Defendant contends the trial court failed to properly conduct the *Batson/Wheeler* hearing when the prosecutor raised her objection to defense counsel's use of peremptory challenges and failed to conduct "a complete and thorough analysis of all of the applicable factors." Defendant asserts this court is not obliged to give any deference to the trial court's findings since the court improperly decided the prosecutor's *Batson/Wheeler* motion "in a global, conclusory fashion, simply invoking 'the totality of the circumstances' and without making specific findings," and the court's ruling "was not 'reasoned.' "

In making this argument, defendant asserts the prosecutor failed to carry her burden to raise a prima facie case, the court lacked any evidence to find a prima facie case since Caucasians are not a cognizable group, the court improperly demanded defense counsel to give reasons for the peremptory challenges, defense counsel's reasons for the challenges were race-neutral and supported by the record, and counsel's desire to

23.

have a jury that was consistent with the area's demographics was not inappropriate under *Batson/Wheeler*.[9]

"Peremptory challenges are a long-standing feature of civil and criminal adjudication. But the exercise of even a single peremptory challenge solely on the basis of race or ethnicity offends the guarantee of equal protection of the laws under the Fourteenth Amendment to the federal Constitution. [Citations.] Such conduct also violates [the parties'] right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. [Citation.]" (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1157 (*Gutierrez*).)

A trial lawyer "may exercise a peremptory challenge against anyone, including members of cognizable groups. All that is prohibited is challenging a person *because* the person is a member of that group." (*People v. Cleveland* (2004) 32 Cal.4th 704, 733; *People v. Armstrong* (2019) 6 Cal.5th 735, 765; *People v. Jones* (2011) 51 Cal.4th 346, 369.) "There is a rebuttal presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination. [Citations.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 341.)

As explained above, these principles apply to a defense attorney's use of peremptory challenges, and prohibit the defense was using challenges to purposefully discriminate against a cognizable group. (*McCollum*, *supra*, 505 U.S. at p. 59.) The prosecutor in this case made a "reverse *Batson*" motion and asserted defense counsel was improperly challenging prospective jurors who were Caucasian. (*Willis*, *supra*, 27 Cal.4th at p. 813.)

As thus applied to this case, the prosecutor, as the opponent of the defense's challenges, had the burden of making a prima facie case of racial discrimination. "[O]nce

---

[9] We grant defendant's request, filed on July 15, 2020, to take judicial notice of the California Supreme Court's statement entitled, "Statement of Equality and Inclusion," pursuant to Evidence Code section 452, subdivision (c).

24.

the opponent of a peremptory challenge has made out of a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race neutral explanation (step two).  If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.  [Citations.]" (*Purkett v. Elem* (1995) 514 U.S. 765, 767; *Gutierrez*, *supra*, 2 Cal.5th at pp. 1158.)  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike, who, in this case, was the prosecution.  (*Purkett v. Elem*, *supra*, 514 U.S. at p. 768; *People v. Lenix* (2008) 44 Cal.4th 602, 612–613.)

## II.     Cognizable Groups

Defendant first contends the prosecutor failed to carry her burden to make a prima facie case because Caucasians are not a "cognizable group" since *Wheeler*, *supra*, 22 Cal.3d 258 was based on "the need to recognize the rights of minority defendants to a jury drawn from a representative cross-section of the community."  Defendant argues this court should be "le[e]ry" of the prosecutor's premise, agreed with by the trial court, that defense counsel was eliminating a cognizable racial group from the jury.

In order to establish a prima facie violation of the fair-cross-section requirement, the party who makes a *Batson/Wheeler* objection and opposes the peremptory challenges, must first show the group allegedly being excluded from the jury is a "cognizable" or "distinctive" group in the community.  (*Batson*, *supra*, 476 U.S. at p. 96; *Wheeler*, *supra*, 22 Cal.3d at p. 280; *People v. Cunningham* (2015) 61 Cal.4th 609, 651–652.)

This has been codified in California in Code of Civil Procedure section 231.5, which governs peremptory challenges and defines cognizable groups to include those characteristics listed in Government Code section 11135, namely "race, national origin, ethnic group identity, religion, age, sex, sexual origin, color, genetic information or disability."  (Gov. Code, § 11135; *People v. Duff* (2014) 58 Cal.4th 527, 544.)

25.

It is thus settled that peremptory challenges may not be used to exclude prospective jurors based on race.  (*Batson*, *supra*, 476 U.S. at p. 97; *Wheeler*, *supra*, 22 Cal.3d at p. 276; *People v. Trinh* (2014) 59 Cal.4th 216, 240.)  It is also settled that African-Americans and Hispanic-Americans are cognizable or distinctive groups for purposes of *Batson/Wheeler*.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 192–193; *People v. Ayala* (2000) 23 Cal.4th 225, 256; *Gutierrez*, *supra*, 2 Cal.5th at p. 1156, fn. 2; *People v. Burney* (2009) 47 Cal.4th 203, 226-228; see also *People v. Brown* (1999) 75 Cal.App.4th 916, 925.)

Defendant argues Caucasians are not a cognizable group based on the definition in *Rubio v. Superior Court* (1979) 24 Cal.3d 93, where the court explained that its "members must share a common perspective arising from their life experience in the group, i.e., a perspective gained precisely because they are members of that group," and that "no other members of the community are capable of adequately representing the perspective of the group assertedly excluded.  This is so because the goal of the cross-section rule is to enhance the likelihood that the jury will be representative of significant community *attitudes*, not of groups per se."  (*Id*. at p. 98.)  The court has further explained that a cognizable group " ' "must have a definite composition … there must be some factor which defines and limits the group.  A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected.… There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience…." [Citations.]' " (*People v. Motton* (1985) 39 Cal.3d 596, 605.)

As noted by defendant, a general category of "non-whites" or "people of color," based on combining all minority members of a venire, has not been found to constitute a cognizable or distinctive group for purposes of a *Batson/Wheeler* motion.  (*People v. Davis*, *supra*, 46 Cal.4th at p. 583; *People v. Manibusan* (2013) 58 Cal.4th 40, 83; *People v. Neuman* (2009) 176 Cal.App.4th 571, 578.)  As explained by the Ninth Circuit, "non-

whites" would not be a cognizable or distinctive group because it "would have no internal cohesion, nor would it be viewed as an identifiable class by the general population." (*United States v. Suttiswad* (9th Cir. 1982) 696 F.2d 645, 649.)

Defendant argues that for the same reasons, whites or Caucasians cannot be considered a cognizable group because it is an "overbroad classification" and there is "no precedent holding that 'whites' is a cognizable group."

The United States Supreme Court has not held whether *Batson* applies to race-based peremptory strikes against Caucasians, but some federal and state courts have addressed and upheld *Batson* motions that were granted based on Caucasians as the cognizable group. (See, e.g., *United States v. Allen–Brown* (11th Cir. 2001) 243 F.3d 1293, 1298; *United States v. Kelley* (5th Cir. 1998) 140 F.3d 596, 606; *Government of Virgin Islands v. Forte* (3d Cir. 1989) 865 F.2d 59, 64; *Roman v. Abrams* (2d Cir. 1987) 822 F.2d 214, 227; *Commonwealth v. Jordan* (Mass. 2003) 785 N.E.2d 368, 377–381; *State v. Shepherd* (Utah 1999) 989 P.2d 503, 510-511 & fn. 4; *State v. Daniels* (Hawaii 2005) 122 P.3d 796, 801–802; *Caudill v. Commonwealth* (Ky. 2003) 120 S.W.3d 635, 657.)[10]

In *People v. Willis*, *supra*, 27 Cal.4th 811, the California Supreme Court addressed a prosecutor's reverse-*Batson* motion that was based on the defense's use of peremptory challenges to remove Caucasian men from the jury. Defendant acknowledges *Willis* but asserts the court merely assumed Caucasians were part of a cognizable group while

---

[10] "It is plain that the exclusion of entire racial groups from jury service for reasons wholly unrelated to the ability of the individuals to serve as jurors in a particular case is squarely within" the definition of a cognizable or distinctive group, and "[t]hough such wholesale exclusion is more often practiced against minorities or traditionally disadvantaged members of society, the exclusion of groups normally in the majority is no less objectionable for it arbitrarily deprives that group of a share of the responsibility for the administration of justice …." (*Roman v. Abrams*, *supra*, 822 F.2d at p. 228.)

addressing the appropriate remedy for a reverse-*Batson* violation where the defendant was African-American. There is more to *Willis* than a mere assumption.

*Willis* discussed the prosecutor's reverse-*Batson* objection to defense counsel's alleged use of peremptory challenges to exclude Caucasian males from the jury. (*Willis*, *supra*, 27 Cal.4th at p. 813.) Defense counsel, "having first unsuccessfully moved to dismiss and replace the entire jury venire as underrepresentative of Blacks, *evidently attempted to solve the problem by using his peremptory challenges to exclude White males from the jury, a clear violation of the People's right to an impartial jury*." (*Id*. at p. 814, italics added.)[11] The prosecutor objected after defense counsel used seven of his 11 challenges to remove Caucasian males. The court made a prima facie finding and directed defense counsel to explain his challenges. Defense counsel "unsuccessfully argued White males were not a protected class under *Wheeler*." (*Id*. at p. 815.) "The trial court, after inquiring of counsel regarding his reasons for excluding these persons, found that he had exercised discriminatory peremptory challenges due to group bias against White males. With the People's assent, the court rejected defendant's motion to dismiss the remaining venire, imposed (and later vacated) monetary sanctions on defense counsel, and continued voir dire with the original venire." (*Id*. at p. 814.) On appeal, the defendant argued the only available remedy for his attorney's *Batson* violation was dismissal of the entire venire and granting a mistrial which had been his objective from the beginning of the case. (*Willis*, at p. 814.) *Willis* disagreed and held that the court had discretion to impose remedies or sanctions short of outright dismissal of the entire jury venire. (*Ibid*.)[12]

---

[11] *Willis* made this unequivocal statement even though it had noted that on appeal, "neither party challenges the trial court's ruling on the *Wheeler* motions or its findings that defendant twice violated *Wheeler*." (*Willis*, *supra*, 27 Cal.5th at p. 816.)

[12] *Willis* explained the scope of possible remedies: "We think the benefits of discretionary alternatives to mistrial and dismissal of the remaining jury venire outweigh any possible drawbacks. As the present case demonstrates, situations can arise in which

28.

In explaining the trial court's optional remedies, however, *Willis* accepted the validity of the court's underlying finding, consistent with holdings from several federal circuits, that the prosecutor's *Batson/Wheeler* objection was properly granted based on defense counsel's use of peremptory challenges to remove Caucasians from the jury, which *Willis* called "*a clear violation of the People's right to an impartial jury.*" (*Willis, supra*, 27 Cal.4th at p. 814, italics added; see also *People v. Morris* (2003) 107 Cal.App.4th 402, 409 [in reverse-*Batson* motion, trial court found defense counsel used peremptory challenges for discriminatory purpose of excusing Caucasian males] (*Morris*).)

We find *Willis* persuasive that Caucasians are a cognizable group and that the trial court in this court properly moved forward on the prosecutor's *Batson/Wheeler* objection and addressed whether she had made a prima facie case for defense counsel's use of peremptory challenges for purposeful discrimination.

## III.    The Court's Finding of a Prima Facie Case

Defendant next contends the prosecutor failed to meet her burden to establish a prima facie case that defense counsel used peremptory challenges to purposefully discriminate against Caucasians and remove them from the jury. Defendant complains the court found the existence of a prima facie case without demanding the prosecutor to

---

the remedy of mistrial and dismissal of the venire accomplish nothing more than to reward improper voir dire challenges and postpone trial. Under such circumstances, and with the assent of the complaining party, the trial court should have the discretion to issue appropriate orders short of outright dismissal of the remaining jury, including assessment of sanctions against counsel whose challenges exhibit group bias and reseating any improperly discharged jurors if they are available to serve. In the event improperly challenged jurors have been discharged, some cases have suggested that the court might allow the innocent party additional peremptory challenges. [Citations.] [¶] Additionally, to ensure against undue prejudice to the party unsuccessfully making the peremptory challenge, the courts may employ the … procedure of using sidebar conferences followed by appropriate disclosure in open court as to *successful* challenges. [Citations.]" (*Willis, supra*, 27 Cal.4th at pp. 821–822.)

identify which prospective jurors had been improperly challenged. As a result, defense counsel was left "largely to guess work" before the court found a prima facie case, shifted the burden, and demanded counsel's justifications for the challenges.

### A. The First Stage of Batson/Wheeler

The moving party in a *Batson/Wheeler* objection "must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges." (*People v. Scott* (2015) 61 Cal.4th 363, 383; *People v. Winbush* (2017) 2 Cal.5th 402, 434.) When the trial court "makes a first-stage ruling before the [proponent of the strike] states his or her reasons for excusing the prospective jurors, an appellate court reviews that first-stage ruling." (*People v. Krebs* (2019) 8 Cal.5th 265, 290.)

"We did not intend the first stip to be so onerous that [the prosecutor] would have to persuade the judge – on the basis of all the facts, some of which are impossible for [the prosecutor] to know with certainty – that the challenge was more likely than not the product of purposeful discrimination. Instead, [the prosecutor] satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California* (2005) 545 U.S. 162, 170; *Rhoades*, *supra*, 8 Cal.5th at p. 428)

" 'Though proof of a prima facie case may be made from any information in the record available to the trial court, we have mentioned "certain types of evidence that will be relevant for this purpose. *Thus the party may show that [her] opponent has struck most or all of the members of the identified group from the venire*, or has used a disproportionate number of his peremptories against the group. [She] may also demonstrate that the jurors in question share only this one characteristic – their membership in the group – and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of [her] opponent to engage these same jurors in more

30.

than desultory voir dire, or indeed to ask them any questions at all….” ’ ” (*Rhoades*, *supra*, 8 Cal.5th at pp. 423–424, italics added.) As a practical matter, it is impossible “to draw the requisite inference where only a few members of a cognizable group have been excused ….” (*People v. Garcia* (2011) 52 Cal.4th 706, 747.)

### B. Analysis

The prosecutor made the *Batson/Wheeler* objection based on the claim that defense counsel used 11 of 14 peremptory challenges to remove Caucasians from the jury. Defense counsel repeatedly argued the prosecutor failed to meet her burden because six of the 12 prospective jurors were Caucasians. While the court apparently concurred with defense counsel’s view of the remaining prospective jurors, that did not undermine the court’s determination that “[b]ased on the numbers and what’s been observed by the court,” there was “a reasonable inference at this time” of a prima facie case of systematic exclusion of prospective jurors who were Caucasians.

As noted by the court, the prosecutor’s motion was not based on defense counsel’s decision to challenge one or two Caucasian jurors, a situation which rarely suggests a pattern of impermissible exclusion. (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 343.) The court properly found counsel had used a “disproportionate number of his peremptories” against a cognizable group and that was sufficient to find a prima facie case. (*Rhoades*, *supra*, 8 Cal.5th at pp. 423–424.)

## IV. Defense Counsel’s Reasons

We next turn to the second step of the *Batson/Wheeler* analysis, where the court directed the defense counsel to give reasons for his peremptory challenges. Defendant acknowledges that the prosecutor produced a list of prospective jurors who had allegedly been improperly challenged. However, defendant asserts defense counsel gave race-neutral reasons for challenging these individuals, the court failed to give deference to counsel’s reasons, and the court “essentially shifted the burden of proving the strikes were not racially motivated” from the prosecution to the defense.

### A.    The Second Stage of Batson/Wheeler

"[I]f the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror[s] by offering permissible, nondiscriminatory justifications." (*People v. Scott*, *supra*, 61 Cal.4th at p. 383.)

The proponent of the strike must "provide a ' "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.] 'The justification need not support a challenge for *cause,* and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.]" (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613.) The basis for the peremptory challenge "may range from 'the virtually certain to the highly speculative' [citation] …." (*People v. Chism* (2014) 58 Cal.4th 1266, 1316.) The challenge may be justified by " 'a neutral explanation related to the particular case to be tried,' " or "may be based on employment [citation]" so long as the reasons are not based on impermissible group bias. (*Ibid.*) "[R]ace-based decisions are not constitutionally tolerable." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 621; *People v. Winbush*, *supra*, 2 Cal.5th at p. 434.)

"In evaluating a trial court's finding that a party has offered a neutral basis – one not based on race, ethnicity, or similar grounds – for subjecting particular prospective jurors to peremptory challenge, we are mindful that ' "[u]nless a discriminatory intent is inherent in the prosecutor's explanation," ' the reason will be deemed neutral. [Citation.]" (*Gutierrez*, *supra*, 2 Cal.5th at p. 1158.)

### B.    Analysis

As explained above, the court directed defense counsel to provide reasons for 10 people on the prosecutor's list of 11 suspect challenges. The People concede on appeal that defense counsel gave race-neutral reasons for the first person on the prosecutor's list, who was satisfied with how his DUI conviction was handle by the district attorney's office; and the fifth person, whose son was a deputy district attorney.

On appeal, the People concede defense counsel's reasons for some challenges were race-neutral if found credible: the second person on the list, who allegedly believed a person should flee instead of defending himself; the sixth person, a woman who allegedly exhibited "antipathy" towards counsel, but the court found counsel's reason was not supported by its notes; and the tenth person, a woman who allegedly was not "comfortable" with counsel's questions.

Defense counsel was unable to give reasons for two people on the list: the seventh person, although the record suggests race-neutral reasons since this person said her husband attended the CHP academy; and the eighth person, whose nephew and two sons-in-law were in law enforcement.

The court found defense counsel's reasons for the third person on the list were refuted by its own notes, and defense counsel failed to give any reasons for the fourth and ninth people.

While defense counsel gave race-neutral reasons for some of his peremptory challenges, and the record suggests race-neutral reasons for challenges that he was unable to give reasons for, there were still several challenges for which counsel could not give reasons, or the court found his reasons were contrary to the court's own notes. Counsel initially said he could check his notes at the break to determine his reasons, and even suggested that he might need a transcript of voir dire to reconstruct what happened. After the break, however, counsel said he could not offer any additional reasons for his challenges, and he did not ask for time to review the transcript of voir dire, thus failing to refute the court's concern that counsel's reasons were not supported by the record.

The court was not obliged to automatically deny the prosecutor's *Batson/Wheeler* motion in light of defense counsel's failure to give race-neutral reasons for his challenges.

## V.    The Court's Ruling

Defendant asserts the court violated his constitutional rights when it granted the prosecution's reverse-*Batson* motion.  Defendant argues the court improperly shifted the burden to the defense, that amounted to the failure to grant defendant the prescribed number of peremptory challenges and his right to excuse a juror before whom he was eventually tried, and, as a result, the court's error was structural and requires automatic reversal.  Defendant asserts that if a party has not engaged in purposeful discrimination, "tinkering with the makeup of the jury by prohibiting the exercise of peremptory challenges, on the mistaken belief that a party is discriminating against a particular group, itself threatens the representative cross-section requirement."

### A.    *The Third Stage of Batson/Wheeler*

If the proponent of the strike "has offered … nondiscriminatory reason[s] the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination.  [Citation.]" (*People v. Scott*, *supra*, 61 Cal.4th at p. 383.)

"When they assess the viability of neutral reasons advanced to justify a peremptory challenge by a prosecutor, both a trial court and reviewing court must examine only those reasons actually expressed.  [Citation.]" (*Gutierrez*, *supra*, 2 Cal.5th at p. 1167.)  The trial court also evaluates the credibility of the neutral explanation, which may be gauged by examining factors such as defense counsel's demeanor, how reasonable or improbable the explanations are, and whether the proferred rationale has some basis in accepted trial strategy.  (*Id*. at p. 1168.)

"Some neutral reasons for a challenge are sufficiently self-evident, if honestly held, such that they require little additional explication." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1171.)  "Yet when it is not self-evident why an advocate would harbor a concern, the question of whether a neutral explanation is genuine and made in good faith becomes more pressing. *That is particularly so when … an advocate uses a considerable number*

34.

*of challenges to exclude a large proportion of members of a cognizable group.*
[Citation.]" (*Ibid.*, italics added.)

"'At the third stage of the *Wheeler/Batson* inquiry, "the issue comes down to whether the trial court finds [defense counsel's] race-neutral explanations to be credible. Credibility can be measured by, among other factors, [defense counsel's] demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." [Citation.]' [Citation.] 'In assessing credibility, the court draws upon its contemporaneous observations of the voir dire.' [Citation.] This assessment may also take into account 'the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.]' [Citation.]" (*People v. Winbush*, *supra*, 2 Cal.5th at p. 434.)

"When a reviewing court addresses the trial court's ruling on a *Batson/Wheeler* motion, it ordinarily reviews the issue for substantial evidence. [Citation.] A trial court's conclusions are entitled to deference only when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' [Citation.] What courts should not do is substitute their own reasoning for the rationale given by the prosecutor, even if they can imagine a valid reason that would not be shown to be pretextual. '[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. … If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.' [Citation.]" (*Gutierrez*, *supra*, 2 Cal.5th at p. 1159.)

"When [defense counsel's] stated reasons are both inherently plausible and supported by the record, the trial court need not question [counsel] or make detailed findings. But when [defense counsel's] stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global

35.

finding that the reasons appear sufficient." (*People v. Silva* (2001) 25 Cal.4th 345, 386; *People v. Williams* (2013) 56 Cal.4th 630, 653.)

" 'We review a trial court's determination regarding the sufficiency of [the defense attorney's] justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that [the defense attorney] uses peremptory challenges in a constitutional manner and give[s] great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*People v. Winbush*, *supra*, 2 Cal.5th at p. 434.)

### B.        Analysis

As explained in issue IV, *ante*, defense counsel was unable to state reasons for several challenges or clarify reasons that the court found were inconsistent with its own notes. A court should be "suspicious when presented with reasons that are unsupported" by the record of voir dire. (*People v. Silva*, *supra*, 25 Cal.4th at p. 385.)

As the parties argued the issue, however, defense counsel ultimately explained why and how he used his peremptory challenges:

> "… I think we're going to find out aside from me saying that I was looking for a jury that was – *because I had Hispanic defendants, I was looking for a jury that represented all aspects of the community, both Caucasians and Hispanics, that some of my challenges were exercised as I say based simply on my years of experience in looking at jurors and seeing whether I thought those jurors would be sympathetic or not sympathetic to my case*." (Italics added.)

Defense counsel added:

> "[B]*ecause my clients are Hispanic, I'm looking for a picture of this community. This community, as the court probably knows this much better than I do with regards to the demographics, if you take Kern County as a whole, were probably 50/50.*

*"That's what we have right now we have a jury that is about 50/50. I'm willing to settle for that I'm not trying to get [rid] of people just because they are white but I'm trying to get a jury that is representative of the demographics of this county."* (Italics added.)

In response, the prosecutor argued given defense counsel's failure to explain several of his peremptory challenges, counsel had admitted using peremptory challenges to remove "people on a race basis level. *You don't get to excuse people because they don't make the right number of Hispanics, Caucasians and African Americans*. That is what *Batson Wheeler* is designed to protect against. [¶] [Defense counsel] said numerous times, because his clients are Hispanics, he was trying to get a more mixed bunch, I guess you would say, out of the jurors that's not a non race neutral reason for exercising individuals." Shortly afterwards, the court granted the prosecutor's *Batson/Wheeler* motion.

On appeal, defendant argues that defense counsel's statements were not inappropriate because he was entitled to a trial by a jury "draw from a representative cross-section of the community," and counsel "identified that right and pointed out that his clients were Hispanic and the seated jury thus far looked to him to be 'half white.'" Defendant asserts it was unfair for the prosecutor to claim his challenges were based on race because that "left no room for the fundamental Sixth Amendment right that was at the source of defense counsel's explanation."

When defense counsel made these statements, however, he did not assert that Hispanic-Americans were underrepresented in how the jury pool or master list of potential jurors was composed in Kern County. (See, e.g., *People v. Cunningham* (2015) 61 Cal.4th 609, 652–654; *People v. Sanders* (1990) 51 Cal.3d 471, 489–496.)[13] Instead,

_____

[13] "The jury 'pool' is the master list of eligible jurors compiled for the year or shorter period from which persons will be summoned during the relevant period for possible jury service. A 'venire' is the group of prospective jurors summoned from that list and made available, after excuses and deferrals have been granted, for assignment to a 'panel.' A 'panel' is the group of jurors from that venire assigned to a court and from which a jury will be selected to try a particular case." (*People v. Bell* (1989) 49 Cal.3d

defense counsel admitted he used peremptory challenges to balance the number of Caucasian and Hispanic individuals who had been on the venire of prospective jurors sent into the courtroom.

> "[W]e have long held that 'no litigant has the right to a jury that mirrors the demographic composition of the population, or necessarily includes members of his own group, or indeed is composed of any particular individuals.' [Citation.] Nor does the Sixth Amendment demand such a precise correlation between the demographics of the community and a particular jury. 'Although a defendant has a right to a jury drawn from a fair cross-section of the community as a means of ensuring his or her right to an impartial jury, *he or she has no right to a jury that reflects the racial composition of the community*. [Citations.]' [Citation.] As the Supreme Court has explained, '[t]he Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does).' [Citation.]" (*People v. Winbush*, *supra*, 2 Cal.5th at p. 447, citing *Holland v. Illinois* (1990) 493 U.S. 474, 480, first italics added.)

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.' [Citation.]" (*Foster v. Chatman* (2016) __ U.S.___ [136 S.Ct. 1737, 1747].) Given defense counsel's inability to explain several of his peremptory challenges, and his admission that he used the challenges to get a jury "representative of the demographics" of the county, the court properly granted the prosecutor's *Batson/Wheeler* motion.[14]

_____

502, 520, fn. 3; Code Civ. Proc., § 194; *People v. Singh* (2015) 234 Cal.App.4th 1319, 1327, fn. 4.)

[14] Given defense counsel's statements and the court's findings, we find there is no reason to undertake a comparative juror analysis in this case. " 'Comparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination.' [Citation.]" (*People v. O'Malley* (2016) 62 Cal.4th 944, 975–976.) "When a court undertakes comparative juror analysis, it engages in a comparison between, on the one hand, a challenged panelist, and on the other hand, similarly situated but unchallenged panelists who are not members of the challenged panelist's protected group. [Citation.]" (*Gutierrez*, *supra*, 2 Cal.5th at p. 1173.)

### C.    The Court's Remedy

Defendant complains the trial court's alleged failure to make appropriate findings under *Batson/Wheeler* resulted in structural error that violated his due process rights and requires automatic reversal.  We have already found that the court properly granted the *Batson/Wheeler* motion.  We further find defendant cannot complain about the remedy imposed in this case.

As explained in *Willis*, the trial court has discretion to fashion alternate remedies after finding a *Batson/Wheeler* violation, particularly in situations where "the remedy of mistrial and dismissal of the venire accomplish nothing more than to reward improper voir dire challenges and postpone trial."  (*Willis*, *supra*, 27 Cal.4th at p. 821.)  *Willis* further states the trial court has discretion to impose an alternate remedy "with the assent of the complaining party."  (*Ibid*.)

In this case, after it granted the prosecutor's *Batson/Wheeler* motion, the court decided not to dismiss the jury, grant a mistrial, and start over with a new venire.  Instead, the court decided to reinstate the individual who had been removed by defense counsel's final peremptory challenge just before the prosecutor's *Batson/Wheeler* motion, and then instructed the parties to continue with voir dire and said they would discuss all further challenges.  The prosecutor disagreed and asked for a new panel instead of

We further note the record would have made it extremely difficult to conduct a comparative juror analysis, since the question would have been whether defense counsel's justifications for striking Caucasians "applies just as well to an otherwise similarly situated" non-Caucasian who was permitted to serve on the jury.  (*Gutierrez*, *supra*, 2 Cal.5th at p. 1173.)  The moving party in a *Batson/Wheeler* motion has the duty to make as complete a record as feasible.  (*Morris*, *supra*, 107 Cal.App.4th at p. 409.)  In addition, the trial court has an important role in making an adequate record when dealing with a *Batson/Wheeler* motion.  (*People v. Reynoso* (2003) 31 Cal.4th 903, 929.)

As explained above, the court used a rather confusing method of voir dire where the individuals were identified by their constantly changing seat numbers that allowed tracking for the first round of peremptory challenges, but became nearly impossible to track when individuals from the second set of voir dire were placed in different seat numbers during the second round of peremptory challenges.

continuing with the same prospective jurors.  Notably, defense counsel specifically stated that he would not object to a new panel.  The court overruled the parties' requests for a new panel.  Defense counsel used two more peremptory challenges and the parties then accepted the jury and alternates as constituted.

The record suggests the trial court may have decided not to dismiss the venire to avoid rewarding defense counsel with a new panel.  While the prosecutor objected to the court's decision, the People have not appealed the court's decision and defendant cannot raise this issue on appeal.  A similar situation was addressed in *Morris*, *supra*, 107 Cal.App.4th 402, where the defense made a *Batson/Wheeler* motion to dismiss the entire venire based on the prosecutor's alleged use of peremptory challenges to remove Black and Hispanics from the jury.  The trial court found the defendant failed to make a prima facie case.  (*Morris*, at pp. 407–408.)  The prosecutor then made a *Batson/Wheeler* motion and argued defense counsel used challenges to remove White males.  (*Morris,* at p. 409.)  The trial court found the People made a prima facie case and asked defense counsel to explain his challenges.  After listening to counsel's reasons, the court found the defense exercised his challenges in a discriminatory manner but instead admonished defense counsel and denied the prosecutor's *Batson/Wheeler* motion in the interests of proceeding with the trial.  (*Morris*, at p. 409.)  The defendant appealed and argued that since the court found the jurors were excused based on impermissible group bias, it was required to grant the People's motion, dismiss the entire venire, and start over with a new venire.  (*Ibid*.)

*Morris* acknowledged that, contrary to Willis, the prosecutor as the moving party of the *Batson/Wheeler* motion did not consent to the trial court's decision not to dismiss the venire.  *Morris* further held that the defendant, who the trial court found improperly exercised peremptory challenges, lacked standing to raise *Batson/Wheeler* error on appeal when that error is based upon "his own counsel's improper exercise of peremptory challenges to exclude a legally cognizable group."  (*Morris*, *supra*, 107 Cal.App.4th at

40.

pp. 413–414.) "Defendant did not suffer a cognizable injury because *he was tried by a jury of his own choosing*. Therefore, the composition of the jury gives defendant no reason to doubt the fairness of the proceeding. Nor does defendant have a close relation to the excluded jurors because defendant himself caused the violation of the excluded jurors' equal protection rights. Thus, it cannot be said … that the excluded jurors and defendant 'have a common interest in eliminating racial discrimination from the courtroom' [citation] because defendant, by committing the discrimination at issue, had no such interest." (*Id*. at p. 413.)

We note that the court's remedy in this case essentially resulted in allowing 10 of defense counsel's 11 peremptory challenges to stand, so that defendant was tried by the jury that defense counsel had selected. There were no structural errors and defendant lacks standing to challenge the court's decision to continue with voir dire from the existing prospective jurors.[15]

## DISPOSITION

Defendant's request, filed on July 15, 2020, to take judicial notice of the California Supreme Court's statement entitled, "Statement of Equality and Inclusion," is granted pursuant to Evidence Code section 452, subdivision (c).

---

[15] On July 13, 2020, the superior court filed an augmented record under seal in this court in response to our order to do so. The augmented record contained confidential information and was not disclosed to the parties. It also contained confidential information that was not responsive to this court's order. On July 15, 2020, appellate counsel, on behalf of defendant, filed a request with this court for an order allowing counsel to view the sealed augmented record because "[t]he augmentation may include material that is relevant to the Court's adjudication of this appeal. To the extent that is the case, counsel needs to see it too in order to properly represent [defendant's] position."

On October 26, 2020, the superior court filed a corrected sealed augmented record in accordance with this court's order.

As set forth above, we have affirmed the judgment based on the record of the *Batson* hearing and have not relied in any way on the confidential materials contained in the corrected sealed augmented record. We therefore deny appellate counsel's request to view the corrected sealed augmented record.

Defendant's request for appellate counsel to view the confidential documents in the corrected sealed augmented record is denied.

The judgment is affirmed.

POOCHIGIAN, J.

WE CONCUR:

LEVY, Acting P.J.

MEEHAN, J.